Keith J. Harrison (416755)
KHarrison@crowell.com
Samuel E. Feigin (452741)
SFeigin@crowell.com
Joanna G. Coyne (1010222)
JCoyne@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ROBO-TEAM NA, INC.,**<br>15890 Gaither Dr.<br>Gaithersburg, MD 20877<br><br>　　　　　　　　　　**Plaintiff,**<br><br>**v.**<br><br>**ENDEAVOR ROBOTICS,**<br>19 Alpha Rd. #101<br>Chelmsford, MA 01824<br><br><br>**SACHEM STRATEGIES**<br>50 Milk St., 16th Floor<br>Boston, MA 02114<br>　　　　　　　　　　**Defendants.** | **COMPLAINT**<br><br>Case No.:<br>Assigned To:<br>Assign. Date:<br>Description: General Civil<br><br><br>JURY DEMANDED |

Plaintiff Robo-Team NA, Inc. ("Robo-Team"), through counsel, alleges as follows against Defendants Endeavor Robotics ("Endeavor") and Sachem Strategies ("Sachem"):

## NATURE OF DISPUTE

1.  This is an action for damages arising out of false, misleading, defamatory, and otherwise unlawful statements about Robo-Team made by the Defendants.  Defendant Endeavor is a direct competitor to Robo-Team in the field of tactical ground robotics systems.  Endeavor, together with their strategy and lobbying firm, Sachem, launched a calculated and sustained campaign in the District of Columbia to defame Robo-Team in an attempt to damage the company's reputation and interfere with its current and prospective business relationships, including, significantly, U.S. Government contracts expected to be awarded in the near future for unmanned ground vehicle ("UGV") programs.

2.  Endeavor hired Sachem, and paid it to prepare a memorandum ("Sachem Memo"), filled with falsehoods, which was disseminated on Capitol Hill, defaming Robo-Team by alleging that it is subject to improper influence and control due to ownership by the Chinese government or Chinese investors.  In sum, the Sachem Memo alleges that the Chinese government and/or Chinese investors (as a proxy thereto) have asserted control over Robo-Team and are stealing ground robotics technology used by the U.S. military.  This narrative is false and defamatory.  Nevertheless, the Sachem Memo presents a case that two pending U.S. Government contracts for UGV programs should not be awarded to Robo-Team based on a falsely asserted connection between Robo-Team and the Chinese government.  Sachem also pushes a legislative proposal that would ban the U.S. Government from awarding UGV contracts to Robo-Team in the future.

3. Sachem also asserts, among other things, that Robo-Team is a foreign company with "little presence in the United States except for a small sales team" and that it has committed violations of the International Traffic in Arms Regulation ("ITAR") by exposing Chinese nationals to restricted technology. These statements, too, are false and defamatory.

4. As a direct result of Defendants' defamatory statements, members of the U.S. Congress sent two letters to the U.S. Undersecretary of Defense for Acquisition, Technology, and Logistics, who is responsible for supervising all acquisitions for the U.S. military. These letters repeat – nearly verbatim – the defamatory statements contained in the Sachem Memo.

5. Defendants also made similar defamatory statements to dozens of U.S. Government officials and private company executives in the robotics industry, including Robo-Team's current and prospective customers.

6. Defendants' slanderous campaign coincides with the competitive bidding process for two significant U.S. Government contracts: the Man Transportable Robot System Increment II ("MTRS") and the Common Robotic System – Individual ("CRS-I") programs and precedes bidding on the Squad Multipurpose Equipment Transport program ("SMET"). Defendants' actions are a transparent attempt to manipulate and interfere with the award of the contracts for these programs. Defendants also attempt blatantly to interfere with Robo-Team's current contractual relationships and prospective business with both the U.S. Government and other private companies.

7. Robo-Team has invested substantial amounts of time, money, and effort in attempting to counteract Defendants' unlawful conduct, which has damaged the company's reputation and business relationships, and continues to do so. Accordingly, this action seeks to

prevent Defendants from making defamatory statements regarding Robo-Team, full compensation for Robo-Team's losses and damaged reputation, and attorney fees.

**PARTIES**

8.  Plaintiff Robo-Team is a U.S. company with its principal place of business located at 15890 Gaither Drive, Gaithersburg, Maryland, 20877. Robo-Team is a leading provider of tactical ground robotic systems, including UGVs. Robo-Team's customers are U.S. government agencies, including all four branches of the U.S. military, the Department of Homeland Security, the Federal Bureau of Investigation, the Joint Improvised-Threat Defeat Organization, and U.S. Border Patrol. Robo-Team also has teaming agreements with a number of private sector robotics companies. Robo-Team is a subsidiary of Robo-Team Defense Ltd., an Israeli company.

9.  Defendant Endeavor is a U.S. company with its principal place of business located at 19 Alpha Rd. #101, Chelmsford, Massachusetts, 01824. Endeavor is also a provider of ground robotic systems to the U.S. Government. Endeavor conducts business in the District of Columbia.

10. Defendant Sachem is a U.S. "government relations" firm with its principal place of business located at 50 Milk St., 16th Floor, Boston, Massachusetts, 02114. Sachem is a defense-focused firm and its work includes lobbying members of the U.S. House of Representatives and Senate. Sachem's public lobbying disclosures show that Endeavor was a client of that firm in 2016 and 2017. Sachem conducts business in the District of Columbia.

**JURISDICTION AND VENUE**

11. The Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different U.S. states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. The Court has personal jurisdiction over Defendant Endeavor pursuant to D.C. Code § 13-423 because Endeavor caused (directly or by an agent) or conspired to cause or assisted in causing tortious injury to the Plaintiff, in whole or in part, in the District of Columbia by its acts alleged herein taking place in the District of Columbia. In addition, Defendant Endeavor transacts business and/or engages in other persistent courses of conduct in the District of Columbia, specifically with respect to bidding for and/or performing under U.S. Government contracts.

13. The Court has personal jurisdiction over Defendant Sachem pursuant to D.C. Code § 13-423 because it caused or conspired to cause or assisted in causing tortious injury to the Plaintiff, in whole or in part, in the District of Columbia by its acts alleged herein taking place in the District of Columbia. In addition, Sachem regularly transacts business and/or engages in other persistent courses of conduct in the District of Columbia, including lobbying members of the U.S. Congress.

14. Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391, as a substantial part of the actions giving rise to the claims herein occurred in the District of Columbia.

**Background Facts**

I. **Robo-Team and Endeavor Are Direct Competitors as Defense Contractors in Robotics.**

15. Robo-Team experienced early success as a U.S. Government contractor, winning several competitive robotics contracts. Endeavor (then named IRobot) was one of Robo-Team's top competitors for many of these contracts.

16. Robo-Team has become aware that Endeavor is spreading false information about Robo-Team to members of the robotics industry. As just one example, in October 2014 at the Association for the Unites States Army Conference in Dallas, Texas, Endeavor's Vice President, Kevin Ryan, approached Robo-Team's CEO, Shahar Abuhazira, and made the false assertion that Robo-Team was copying Endeavor's technology. Mr. Abuhazira heard the baseless rumor both prior to and following Mr. Ryan's stunt at the conference.

17. In 2014 and 2015, Robo-Team and Endeavor went head-to-head in competition for a particularly significant contract with the U.S. Air Force. Robo-Team ultimately won in September 2015.

18. Immediately after Robo-Team won the September 2015 contract, Endeavor worked hard to persuade Robo-Team to partner with Endeavor on federal bids and otherwise. In fact, Endeavor's then Chief Technologist, Orin Hoffman, went so far as to appear at the home of Robo-Team's CEO one evening in May 2016 to make an intense personal plea. When Mr. Abuhazira protested Endeavor's habit of spreading false information about Robo-Team, Mr. Hoffman was unapologetic and indicated this type of misconduct was business as usual for Endeavor.

19. Robo-Team ultimately did not partner with Endeavor, and Endeavor responded by stepping up its campaign of defamatory statements.

**II.     Robo-Team and Endeavor Are Competing for the U.S. Army's MTRS and CRS-I Programs.**

20.     In 2014 and 2015, the U.S. Army was preparing to issue a Request for Proposals ("RFP") for the MTRS program.  The contract for the MTRS program has an estimated value of $250 million. This was one of the largest robotics contracts offered by the U.S. military in the previous 15 years.  The RFP was published in November 2016.  Robo-Team submitted a bid for the MTRS program in January 2017.  On information and belief, Endeavor submitted a competing bid.  The contract will be awarded imminently.

21.     In addition, the U.S. Army published an RFP for the CRS-I program in May 2017. The contract for the CRS-I program is even larger than the contract for the MTRS program. Robo-Team will be submitting a bid for this program by the deadline of July 18, 2017.  On information and belief, Endeavor will be submitting a competing bid for this program as well.

**III.     Endeavor and Sachem's Defamation Campaign Against Robo-Team in Washington D.C.**

22.     Rather than compete fairly for robotics contracts, Endeavor sought to gain an unfair advantage by engaging in a false information campaign against Robo-Team.  The goal of this campaign was to damage Robo-Team's reputation and standing in the government contracting community by falsely alleging that Robo-Team is controlled by Chinese investors, that awarding the MTRS and CSR-I contracts to Robo-Team would expose U.S. Army technology to the Chinese government, and that Robo-Team has already committed illegal acts that violated ITAR regulations.

23.     Robo-Team has received evidence of one example of Defendants' defamatory campaign: the Sachem Memo, which has been reportedly disseminated on Capitol Hill.  The Sachem Memo is attached hereto as Exhibit 1.  The Sachem Memo identifies Robo-Team as one

of the "Foreign Threats" to U.S. ground robotics technology. The false and defamatory statements in the Sachem Memo, include, but are not limited to:

- "There are strong connections between China and an Israeli company competing for the MTRS Inc II and CRS-I contracts."

- "The contractor in question, Roboteam, is a military ground robotics company based in Israel. The company, which has little presence in the United States except for a small sales team, was recently 100% funded by a consortium of Chinese investors."

- "In August 2016, Roboteam raised $50M from Feng He Investment Group based in Shanghai, China and Singapore … As a result Roboteam's corporate structure is heavily controlled by Chinese ownership."

- "More disturbingly, Roboteam recently hosted a coalition of Chinese delegates at sensitive locations in Israel, exposing Chinese nationals to ITAR restricted technology, in apparent violation of ITAR regulations."

- Robo-Team is not a U.S. company and therefore is not "subject to a transparent corporate reporting regime, which allows for strict oversight from DoD."

24. The Sachem Memo demonstrates that Defendant Endeavor hired Defendant Sachem to help damage Robo-Team's reputation and interfere with the award of contracts for the MTRS and CRS-I programs, as well as Robo-team's other business relationships. Further, Defendants are actively conspiring to prevent Robo-Team from competing in any U.S. Government contracts in the future, which would include the SMET program (with an estimated value of $1 billion).

25. In October 2016, Mr. Abuhazira received a telephone call from a government contracting customer, asking about rumors that Robo-Team was bought by the Chinese government. This information was reportedly relayed to the customer by Orin Hoffman at Endeavor.

26. In response, Mr. Abuhazira personally reached out to Endeavor's CEO, Sean Bielat to arrange a telephone call, which took place on or about October 31, 2016. On the call,

Mr. Abuhazira requested that Mr. Bielat instruct Endeavor's senior executives to stop spreading false information about Robo-Team. Mr. Bielat verbally provided assurances that Endeavor would not engage in such misconduct going forward.

27. Then, on December 6, 2016, Congressman Seth Moulton sent a letter to the Undersecretary of Defense for Acquisition, Technology, and Logistics, Frank Kendall, at 3010 Defense Pentagon, Washington, D.C., 20301-3010 ("Moulton Letter"). The Moulton Letter mentioned one and only one company: Robo-Team. The letter made several false, misleading, defamatory, and otherwise unlawful statements about Robo-Team. Those statements were lifted verbatim from the Sachem Memo. The Moulton Letter is attached hereto as Exhibit 2.

28. The Moulton Letter falsely asserted, among other things, that:

- "There are strong connections between China and an Israeli company competing for the MTRS Inc II and CRS-I contracts."

- "The contractor in question, Roboteam, is a military ground robotics company based in Israel. The company, which has little presence in the United States except for a small sales team, was recently 100% funded by a consortium of Chinese investors."

- "In August 2016, Roboteam raised $50M from Feng He Investment Group based in Shanghai, China and Singapore … As a result Roboteam's corporate structure is heavily controlled by Chinese ownership."

- "More disturbingly, Roboteam recently hosted a coalition of Chinese delegates at sensitive locations in Israel, exposing Chinese nationals to ITAR restricted technology, in apparent violation of ITAR regulations."

- "Chinese influence in the corporate structure of Roboteam has also been revealed through the company's visible role in fostering high-level Sino-Israeli relations. Roboteam's CEO, Yossi Wolf, sits on the Executive Committee of the Israeli Robotics Association (IRA)."

29. The Moulton Letter intended to impact the outcome of the MTRS and CRS-I competitive bidding processes, maximizing Endeavor's business prospects, and minimizing Robo-Team's business prospects. Indeed, Representative Moulton closed his letter by asking

that "the Department of the Army carefully … examine the evidence of Chinese influence when considering the award of the MTRS Inc II and CRS-I contracts."

30. On information and belief, Representative Moulton has a personal friendship with Endeavor's CEO, Mr. Bielat, as they once served together in the U.S. Marine Corps.

31. On January 5, 2017, U.S. Congressional Representatives Niki Tsongas, Vicky Hartzler, Michael Turner, Mike Rogers, Madeleine Bordallo, and Steve Knight, signed a second letter to Undersecretary Kendall, ostensibly to voice concerns regarding the Chinese government "actively seeking to purchase a stake in foreign companies competing for" the MTRS and CRS-I programs ("Tsongas Letter").  The Tsongas Letter is attached hereto as Exhibit 3.

32. The Tsongas Letter attaches "open-source information documenting Chinese efforts to acquire at least one foreign company that plans on competing for the MTRS and CRS-I contracts."  While the letter does not mention Robo-Team by name, the individual that brought the letter to Robo-Team's attention stated that the supporting materials that were circulated with the letter relate exclusively to Robo-Team.

33. The Moulton Letter bears a striking resemblance to the Sachem Memo, copying several false and defamatory sections.  The Tsongas Letter also borrows heavily from the Sachem Memo.

34. Robo-Team quickly felt the damaging impact of Defendants' defamatory campaign.  In January 2017, Robo-Team received a series of complex Requests for Information ("ROIs") from the U.S. Department of State located in Washington, D.C.  This ROI is still ongoing.  In February 2017, Robo-Team also received an ROI from the U.S. Department of Defense.  Robo-Team spent a significant amount of time and resources responding to these ROIs.

35. In January 2017, Robo-Team also received an inquiry from a Wall Street Journal reporter, and had to respond to the same.

36. After January 2017, Robo-Team was forced to respond to inquiries from dozens of current and prospective customers, who reported that Endeavor had communicated the same false information contained in the Sachem Memo.

37. Robo-Team continues to receive inquiries stemming from Defendants' defamatory campaign from current and prospective customers up until today.  Defendants' illegal conduct has and continues to inflict significant harm on Robo-Team.  The campaign has damaged customer relationships and Robo-Team's good will, and delayed orders and contracts. In addition, it has forced Robo-Team to spend countless hours conducting damage control and dispelling false statements to current and prospective clients.

## COUNT I
## DEFAMATION

38. Plaintiff Robo-Team re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

39. Defendants made false, misleading, defamatory, and otherwise unlawful statements in the Sachem Memo, to members of the U.S. Congress, and to Robo-Team's current and prospective customers.

40. In making these statements, Defendants falsely alleged that Robo-Team was subject to improper influence due to ownership by the Chinese government or investors who are Chinese nationals; violated ITAR regulations; and has a limited presence in the U.S.

41. Defendants made and published these and other defamatory statements wantonly, willfully or negligently, and without privilege, to third parties.

42. Defendants knowingly made these statements in bad faith and/or with reckless regard for their truth or impact on Robo-Team.

43. These statements were also defamatory *per se.* They injured Robo-Team in its trade, profession, and standing with the U.S. Government and the robotics industry in that they imputed falsehood, dishonesty, and unlawful conduct to Robo-Team in its business practices and representations to U.S. Government officials and the robotics industry. Robo-Team has been prejudiced in the conduct of its business with the U.S. Government, as well as current and prospective partners in the private sector, and its good commercial reputation has been harmed, subjecting Robo-Team to spurious calls for investigation, actual investigation, and damaging its ability to obtain and maintain government and commercial contracts.

44. As a result of Defendants' false and defamatory statements, Robo-Team has suffered and will continue to suffer monetary damages in excess of $75,000 in an amount to be proven at trial.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND OTHER BUSINESS RELATIONSHIPS

45. Plaintiff Robo-Team re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

46. Robo-Team is a party to several contracts with the U.S. Government and teaming agreements with private sector companies.

47. Robo-Team also has prospective business relationships with the U.S. Government and with private sector companies.

48. At the time of the Sachem Memo and other defamatory statements, Defendants knew of Robo-Team's contracts with the U.S. Government and private sector companies, as well

Robo-Team's prospective business relationships. Indeed, Endeavor was in fierce, direct competition with Robo-Team for customers in the robotics market, so it was well-aware of Robo-Team's valuable customer relationships and prospects.

49. Defendants intentionally interfered, without privilege or justification, with Robo-Team's contracts, as well as prospective business relationships between Robo-Team and the U.S. Government or private sector companies. In short, Defendants actions were designed to disrupt, delay, suspend, prevent, or terminate Robo-Team's current and prospective contractual and business relationships.

50. As a result of Defendants' tortious interference, Robo-Team has suffered monetary damages in excess of $75,000 in an amount to be proven at trial.

## COUNT III
## CIVIL CONSPIRACY

51. Plaintiff Robo-Team re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

52. Defendants combined and conspired with purpose to defame Robo-Team and tortiously interfere with the company's contractual and other business relationships.

53. As described above, through this conspiracy, Defendants did defame Robo-Team and tortiously interfere with the company's contractual and other business relationships.

54. As a result of this conspiracy, Robo-Team has sustained and will continue to sustain, substantial injury, loss, and damages in excess of $75,000 in an amount to be proven at trial.

## COUNT V
## UNFAIR COMPETITION

55.     Plaintiff Robo-Team re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

56.     Defendants engaged in unlawful intentional business practices by and through their defamatory campaign against Robo-Team and their tortious interference with Robo-Team's contractual and other business relationships.

57.     Defendants' unlawful business practices have damaged Robo-Team's reputation, good will, and customer relationships, and delayed orders and contracts.  Defendants have sustained, and will continue to sustain, substantial injury, loss, and damages, in excess of $75,000, in an amount to be proven at trial.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in Robo-Team's favor, granting the following relief, jointly and severally, against the Defendants:

a)     Monetary damages, including economic, consequential, and punitive damages to be proven at trial;

b)     Permanent injunctive relief to prevent Defendants from making defamatory statements regarding Robo-Team;

c)     Permanent injunctive relief to prevent Defendants from tortiously interfering with Robo-Team's contractual and other business relationships;

d)     Costs and attorneys' fees as allowed by law;

e)     Pre- and post-judgment interest as allowed by law; and

f)     Other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

DATED this 27th day of June, 2017.

                Respectfully submitted,

                */s/ Keith J. Harrison*
                Keith J. Harrison
                Samuel E. Feigin
                Joanna G. Coyne
                CROWELL & MORING LLP